**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BETH SZAROLETA, | Civil Action No.: 15-cv-03436 (PGS) |
| *Plaintiff*, | |
| v. | **MEMORANDUM AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| *Defendants.* | |

This matter is before the Court on the appeal of Plaintiff, Beth Szaroleta ("Plaintiff") of the final decision of the Commissioner of Social Security ("Commissioner"), denying Plaintiff disability benefits under the Social Security Act (the "Act").

Plaintiff initially filed an application for Social Security Disability Benefits on July 27, 2006, alleging disability beginning on August 1, 2002 due to anxiety related disorders, back problems, thyroid conditions, and asthma[1]. Upon denial at the administrative level, Plaintiff filed suit in District Court. Thereafter a District Court Judge entered a Consent Order to remand the matter to the Administrative Law Judge (ALJ) for a reconsideration of Plaintiff's Residual Functional Capacity (RFC) and to obtain additional testimony from a vocational expert. On remand the ALJ issued a second unfavorable decision on June 4, 2012.

On July 17, 2013 Plaintiff filed suit in the District Court for the second time. District Court Judge Wolfson reversed the Commissioner, finding that the elements of the Residual Functional Capacity (RFC) were speculative and not based on substantial evidence.

---

[1] At the hearing before ALJ on November 18, 2014, Plaintiff's attorney amended Plaintiff's disability onset date to January 1, 2005. Therefore, the relevant time period for the decision is January 1, 2005 through December 31, 2007.

More specifically, the case was remanded to address Plaintiff's RFC with regard to:

1)      Plaintiff's limitations based on her range of motion of her neck and asthma;

2)      Plaintiff's mental limitations based on Plaintiff's panic attacks.

The third hearing before an ALJ occurred on November 18, 2014 and resulted in another decision denying Plaintiff's application for benefits.  This case was appealed to this Court, once again, on May 19, 2015.

A.      Background

Plaintiff was born on February 28, 1961.  (R 27).  She has a high school diploma, and attended a vocational school for computer technology for a few months.  (R. 26-27). Most recently, Plaintiff was the vice president and general manager of an investor relations firm.  She served in this role for twenty years.  Responsibilities included: drafting press releases; setting up investor briefings for CEOs, CFOs, and clients; and planning meetings, including booking hotels and necessary equipment.  Plaintiff was also responsible for managing payroll.  (R. 27-28). Plaintiff alleges that she stopped working in February 2002 because of back pain, panic attacks, and depression.  (R. 27).

Adult Function Report

On August 25, 2006, Plaintiff completed an Adult Function Report (AFR) in support of her application.   Plaintiff reported  that her day is spent eating, drinking, taking medications, sleeping, doing light house work and shopping, working out to the best of her ability, cooking, resting, feeding her cats, and watching television.  Plaintiff also explained that she is responsible for caring for her spouse and her two cats. (R. 121-22).  Plaintiff noted that before illness she could run, jump, stand for prolonged periods, lift, and stay awake on routine.  (R. 122).  With the onset of her illness, she has erratic sleeping habits during the day and night. Id.

Regarding personal care, Plaintiff has no problems with hair care, or feeding herself. (R. 122). However, she finds dressing, bathing, shaving, and using the toilet problematic. If any personal care activities include more than moderate lifting and bending she will struggle. Plaintiff can cook simple meals (e.g. eggs, sandwiches, cereal) which take no longer than five minutes to prepare. (R. 123). Plaintiff can perform housework, and limitations occur when heavy lifting or pain occur. Plaintiff claims she cannot do any type of yardwork. Plaintiff is outside every day, and can drive a car.

Plaintiff shops for necessities (food, clothes, toiletries, etc.) using all available retail outlets (stores, phone, mail, and computer). (R. 123). Plaintiff can perform banking chores such as paying bills. Id. Plaintiff's hobbies include watching television and listening to music every day. Plaintiff socializes routinely, except if her ability to function is impaired. (R. 124). Plaintiff reported she has no problems talking, hearing and seeing. Her memory, understanding, using her hands, and following instructions are intact. (R. 125). She reported that she needs no reminders to go places; and is able to go places unaccompanied. She reported that many of her activities are intermittent and depend on the time of day the activity occurs. (R. 126). Plaintiff's ability to function fluctuates based on sleep and rest patterns. Plaintiff experiences anxiety due to her chronic illnesses and this results in stress and sleep disorders. (R. 128).

Plaintiff also submitted a document entitled Disability Report – Appeal. (R. 152-49). In that undated report, Plaintiff expressed that her conditions have become "worse" (R. 153) and her impairments affected her ability to care for her personal needs. (R. 157).

Plaintiff's medications include Allegra, Levoxyl, Singular, Lipitor, Pepcid, Albuterol, Advair, Lexapro, Xanax, Vicodin, and Celebrex as needed. (R. 181).

A.    *Review of Medical Evidence During Relative Time Period*

Treatment of Back and Neck Impairments

Robert Rosen, M.D.

On January 5, 2005, Plaintiff visited her then treating physician, Dr. Robert Rosen, after a trip and fall on a cruise ship six weeks prior.  (R. 14, 212).  Dr. Rosen noted that Plaintiff was uncomfortable when standing or walking and Plaintiff was slightly uncomfortable when sitting. Dr. Rosen found Plaintiff's paravertebral muscles show[ed] mild tenderness and spasm bilaterally.  Dr. Rosen believed the discomfort to be "straight forward mechanical pain . . . nothing to suggest a radiculopathy."   Dr. Rosen also noted that Plaintiff's left SI joint had mild sacroiliitis. Plaintiff was treated with Motrin 600 mg and referred to physical therapy.

Plaintiff began said physical therapy in January 2005 and continued until February 24, 2005.   Physical therapy notes focus on the treatment of "lumbago" (low back pain) and there is no mention of therapy to Plaintiff's neck.  (R. 182-199).

On February 2, 2005, Plaintiff had a follow-up examination with Dr. Rosen.  During this visit, Dr. Rosen found that Plaintiff continued to experience primarily central lumbar and sacral area pain that worsened with prolonged standing.  Dr. Rosen noted that the results of his examination were normal. He found that the Plaintiff's thoracic and lumbar spinous processes were aligned and nontender to palpitation or percussion, her SI joints were normal, she experienced no significant paravertebral spasms or tenderness, and her strength and sensory exam results were normal.   During this visit, Dr. Rosen ordered an MRI of Plaintiff's lumbar spine.  (R. 211).

<u>Dr. Nasser Ani</u>

On October 2, 2006 Dr. Nasser Ani became the treating physician for Plaintiff's neck and back pain. (R. 15, 33, 338).  During that visit Plaintiff complained of sharp, stabbing pain in her neck and back which was interfering with Plaintiff's sleep.  Dr. Ani diagnosed Plaintiff with degeneration of the C4 disc, degeneration of the L4 disc, cervical radiculitis, and radiculopathy. Examination of station and gait were normal and she was able to undergo exercise testing and/or participate in an exercise program. Plaintiff reported smoking three to four times a day.  (R. 340).

On October 6, 2006, Plaintiff treated with Dr. Ani for back and neck pain.  The location of the pain was her neck and was described as burning, crushing, pressure, sharp and stabbing. The pain was a 9 out of 10 and was interfering with most daily activities and sleep.  She also reported pain in the lumbar region of her back, which was also aching, burning, pressure, sharp and stabbing.  She reported that it first began after a spinal tap in 1992.  On examination her gait and station were normal and it was reported that she can undertake exercise testing and participate in an exercise program.  There was normal curvature of the cervical spine, no tenderness, no muscle spasm and active range of motion. Flexion and extension was restricted. Right and left lateral rotation was restricted; there was no pain when rotating shoulders. Muscle strength normal. Sensation was normal with no instability.  There was a normal inspection of the thoracic spine, normal range of motion and muscle strength, tone, and stability.  Inspection of the lumbar spine found normal curvature, no tenderness, no muscle spasm and active range of motion. Flexion and Extension were restricted but there was no pain when rotating hips; no pain when abducting hips. Muscle strength normal.  The straight leg test was asymptomatic bilaterally.  There was normal examination of the sacral spine. Examination of the upper and

lower extremities found normal inspection, normal range of motion, normal muscle tone and strength and normal stability. The neurological examination was normal. The psychiatric examination found normal mental status, judgment and insight. (R. 340).

On November 20, 2006, Plaintiff reported to Dr. Ani that she has good and bad days. Vicodin was discontinued and replaced with Darvocet. She was referred to physical therapy, and a facet block (paravertebral block) was to be scheduled. (R. 351).

In January and April 2007, Darren Freeman, D.O., (Dr. Ani's associate) saw Plaintiff for evaluation of her neck pain that Plaintiff indicated was aggravated by all physical activities, driving, head movements, and overhead activities (R. 349, 361). Upon examination, he reported no muscle spasm, the spine had normal curvature, she had normal muscle strength, and there was active range of motion in the cervical spine. He reported that Plaintiff's sensation was normal and that there was not instability noted. (R 350, 362).

On January 9, 2008, Plaintiff responded that she was feeling better with response to injection therapy, but that the pain had returned. There was no tenderness in the cervical spine and Plaintiff had active range of motion. She did not want another injection on that date, and decided to wait. (R. 420). She was prescribed Vicodin. (R. 422).

On April 14, 2008, during a visit, Dr. Ani recommended that Plaintiff obtain a donut for sitting and a "coccyx block."

On November 19, 2008, Plaintiff reported that there was much improvement of her neck and lower back pain. She reported that she had stiffness when laying down for a long period of time. (R. 412).

On August 6, 2008, Plaintiff underwent a post-date last insured cervical spine MRI that revealed small posterior ridges, moderate bulging at C4-C5, C5-C6, a small central subligamentous disc herniation at C5-C6, moderate impression of the anterior thecal sac at those levels, and a slight disc desiccation. No significant cord compression was otherwise evident. (R. 381).

Treatment of Asthma

Plaintiff treated with various physicians for symptoms of asthma.

On July 4, 2002, Plaintiff was treated by Timolyne Skinner, M.S.N. for dizziness. At the time, she denied chest pain, shortness of breath and diaphoresis. She reported having more congestion from allergies over the previous couple of days, and had been swimming on a regular basis. She denied any other respiratory symptoms. She denied weakness or fatigue. She reported having asthma for 22 years. She reported taking Serevent and Flovent for her asthma, but that she doesn't use them all of the time. She reported a history of anxiety and panic disorder which was treated for many years, but that she was now stable and not taking medication. (R. 296).

On December 2, 2002, Plaintiff was treated by Oul-Hammou, M.D. for swollen glands and, nasal congestion, and clogged ears. It was noted that her breathing was better when using Serevent and Flovent twice a day. On examination, her chest was clear to auscultation bilaterally.

On October 2, 2003, Dr. Rosen treated Plaintiff for shortness of breath. He prescribed an albuterol nebulized treatment and a course of steroids.

On October 21, 2006, Plaintiff was treated for wheezing and shortness of breath. The treatment noted indicated "tobacco abuse". She was prescribed a nebulizer as needed, and given a prescription for Chantix. (R. 328).

On a January 14, 2004 Medical History Form, Plaintiff reported her current medications as Advair, Proventil and Synthroid. She also indicated that she smoked ½ pack of cigarettes a day. (R. 252).

On March 3, 2004, Dr. Rosen indicated, "I believe that she was doing quite well." (R. 238).

On July 2, 2004, Plaintiff reported to Dr. Shufang Feng, M.D. that she quit smoking, but really still smokes one or two cigarettes a day. (R. 225).

On September 9, 2004, Plaintiff had a medical visit with Amanda Borgstrom, RN, MSN, in order to refill her asthma medication. Nurse Borgstrom indicated that Plaintiff had been taking the Atrovent as directed with excellent results. She denied any wheezing and felt that her breathing has improved significantly. (R. 218).

On July 6, 2005 Shufang Feng, M.D., was seen for a follow up of her diabetes, allergies, hypothyroidism, asthma and GERD. She was on Advair for her asthma, and reported no chest pain or shortness of breath, other than occasional wheezing at which time she uses her Proventil or Atrovent inhaler. (R. 204).

On September 17, 2005, Plaintiff was treated by Shufang Feng for loss of voice, congestion, clogged ears, and wheezing. Plaintiff stated that she started a nebulizer treatment the day before, but that the medicine was about two years old, so she wasn't sure if it expired or not. She was diagnosed with laryngitis, tightness of chest due to asthma, diabetes, and hypothyroidism. (R. 200).

Pursuant to a subsequent September 22, 2005 examination, Ayesha Ould-Hammou, M.D., reported that Plaintiff took additional medication for audible wheezing. Dr. Ould-Hammou noted that Plaintiff was not in acute respiratory distress, that her prescribed medication produced significant improvement in her rhonchi, and that Plaintiff indicated that she felt "much better" (R. 201).

Residual Functional Capacity Assessment

On February 26, 2007, James Paolino, a state agency physician, reviewed the medical file and performed a physical residual functional capacity assessment of Plaintiff. (R. 15, 317-24). Dr. Paolino's notes reflected that Plaintiff indicated that she was experiencing shortness of breath and back pain that limited her ability to stand, lift, run, and jump. (R. 318). Dr. Paolino found that Plaintiff's records demonstrated the ability to stand for at least two hours in an eight-hour work day, sit for six of eight hours of a workday, and sometimes lift up-to twenty pounds. Notes also reflected that Plaintiff experienced postural limitations due to arthritis of the spine, but determined that Plaintiff did not have any manipulative, visual, or communicative limitations. (R. 319-21). Dr. Paolino noted that environmental factors from chronic asthma were also limiting. (R. 321). Specifically, Plaintiff should avoid concentrated exposure to extreme hot or cold, wetness, humidity, and noise. Dr. Paolino also advised that Plaintiff should avoid moderate exposure to fumes, odors, dusts, gasses, and poor ventilation. However, it was noted that there were no treating or examining sources noted in the file regarding her physical limitations. (R. 323).

<u>Consultative Physical Examination</u>

On February 7, 2009, Dr. Francky Merlin, the consultative medical expert, examined Plaintiff, and provided a "medical source statement of ability to do work-related activities." (R. 385-97, 439).

Plaintiff reported that she had been diagnosed with asthma 28 years prior and that her last attack was a year before the examination. She reported that it lasted approximately 2 hours and was relieved by Xopenex nebulizer. She claimed that she had been to the emergency room, but she did not have to be hospitalized. She also took Advair, Singulair, and albuterol inhaler.

On physical examination, Plaintiff's station and gait were normal. She had no difficulty getting up from a seated position or getting on and off the examining table. Grasping strength and manipulative functions were not impaired. Plaintiff was able to flex her spine forward 0-60 degrees, squat, and walk on her heels and toes. Tenderness was elicited in the neck. Range of motion of the neck, left rotation was 0-60 degrees, right rotation was 0-75 degrees, flexion 0-45 degrees, and extension 0-45 degrees.

Range of motion of the elbows, flexion/extension 0-150 degrees bilaterally, supination 0-80 degrees bilaterally, and pronation 0-80 degrees bilaterally. Range of motion of the wrists, dorsiflexion 0-60 degrees bilaterally, palmar flexion 0-60 degrees bilaterally, ulnar deviation 0-30 degrees bilaterally, and radial deviation 0-20 degrees bilaterally. Tenderness was elicited in the lumbar region, but there was no paravertebral hypertonicity. Range of motion of the knees was flexion/extension 0-150 degrees bilaterally. Range of motion of the ankles was dorsiflexion 0-20 degrees bilaterally and plantar flexion 0-40 degrees bilaterally. Neurologically she was alert, conscious, and oriented. There was normal response to light touch, pinprick, and vibration. Reflexes were 2+/2+ bilaterally. Straight leg raise was 0-60 degrees bilaterally.

Dr. Merlin found that Plaintiff could sometimes lift and/or carry up to ten pounds, sit for no more than two hours at a time without interruptions — or a total of four hours during an eight-hour workday. (R. 391-92). Dr. Merlin also noted that Plaintiff could not tolerate any exposure to unprotected heights, moving mechanical parts, humidity and wetness, extreme cold, dust, odors, fumes, or pulmonary irritants. (R. 396).

Treatment for Mental Health Symptoms

Throughout the treatment notes from Dr. Ani's office, Plaintiff has been prescribed Xanax; however, there is no indication who prescribed the Xanax, nor any notes from Dr. Ani relating to Plaintiff's mental health.

The sole report in the record with regard to Plaintiff's mental health is the May 23, 2008 letter from Louis Abenante, M.D. He reported that Plaintiff had been under his care since 2006, and that he prescribed Xanax for treatment of panic attacks that occur once or twice a week. Dr. Abenante then noted that Plaintiff was doing well on the medications, and that her judgment was intact, and her prognosis was fair. (R. 380).

Consultative Mental Health Examination

On December 28, 2006, Plaintiff was examined by Dr. Williamson for a psychiatric consultative examination. She was not currently being treated. She reported that she was prescribed Xanax for nine years, but she discontinued it in 2003 due to fears of dependency. She reported to Dr. Williams that her medical difficulties were thyroid problem, hernia, diabetes, and being lactose intolerant. She reported that she had never been hospitalized for either psychiatric or medical reasons.

On examination, there was no evidence of a thought disorder, there were no noted compulsions of thinking and or behavior. She was able to complete serial 7's, subtracting 7 from

100 in reverse order, and simple mathematical calculation. Dr. Williamson found that the Plaintiff appeared depressed and anxious. Dr. Williamson also noted that Plaintiff had a long-standing history of psychiatric depression and anxiety. (R. 299)

<u>Mental Residual Functional Capacity Assessment</u>

On January 1, 2007 Dr. Joan F. Joyson performed an initial mental residual functional capacity assessment. Dr. Joyson found that Plaintiff's impairments fall into the category of Affective Disorder, and Anxiety Related Disorder, but that her symptoms did not precisely satisfy the diagnostic criteria for those disorders. (R. 314-16).

She noted that Plaintiff was not significantly limited in her ability to perform activities within a schedule, sustain an ordinary routine, make simple work-related decisions, or adapt to workplace changes. Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions. Only moderate limitations existed for Plaintiff to complete a normal workday without interruptions from psychological symptoms and to perform at a consistent pace without an unreasonable amount of rest periods.

<u>Hearing Testimony</u>

The ALJ and her attorney agreed that Plaintiff need not restate her testimony from the hearing in 2005. (R. 676-77). Testimony then focused on continuing treatment regarding orthopedic problems in Plaintiff's neck and back. Plaintiff explained that she had been undergoing regular treatment for these problems since her last hearing in 2011. (R. 685). Plaintiff still had asthma, but said of her condition: "I still have problems here and there. I still take medications every day. I still, you know, have my sprays on hand in case of emergency**."** <u>Id.</u> Plaintiff also complained of pulmonary irritants, and confirmed she was still under psychiatric treatment for anxiety. <u>Id.</u> Plaintiff stated that her anxiety had persisted in the same

manner since 2005, and she had panic attacks "once or twice a week," but takes medication to help manage the problem.  Id.  The ALJ asked if Plaintiff had been to the emergency room for any panic attacks, to which she explained that she had and it was a couple of years ago.  (R. 687).

Plaintiff then explained that she was taking medication for her asthma, psychiatric conditions, and pain medication.  Id.  Plaintiff took four Percocet a day to alleviate her neck and lower back pain, and has been on narcotics for pain management for the whole history of her back and neck ailments (approximately nine years from the date of the Administrative hearing).  Id.  Plaintiff complained that the pain medication makes her tired, causes her to have difficulty focusing and paying attention.  (R. 688).  Her daily activity was restricted and made simple tasks difficult to complete.  Id.  Plaintiff was unable to clean her own house, lift anything heavy, and has difficulty carrying items at the store.  Id.  Plaintiff stated this has been occurring for nine years.  Plaintiff also explains that her husband has to drive her places, because she is afraid to drive on pain medications.  (R. 689).  Plaintiff explained that she has not been able to work since 2002.  Id.

The ALJ asked Plaintiff what kind of pain she has in her neck.  (R. 689).  Plaintiff stated she has three herniated disks, and has radiating pain from her neck to the middle of her back.  Id.  The pain is a "sharp, stabbing pain" which is only alleviated by lying down.  (R. 690).  Plaintiff also explained how her back cracks, and how there is no way to stop the loud cracking.  Id.

The ALJ next questioned the vocational expert, Mr. Meola ("VE").  (R. 691).  He proposed to the VE a hypothetical which assumed a person of the Plaintiff's age, education and work experience who is limited to sedentary work; occasional postural maneuvers except never climbing ladders, ropes, or scaffolds; limited to frequent head turning from side to side; limited concentration to fumes, odors, dust gases, and extremes of temperature;  limited to simple,

routine repetitive tasks, simple work-related decisions, a few workplace changes; limited to occasional interaction with supervisors, coworkers, and the general public; with this person being off task up to ten percent of the work due to mental difficulties. (R. 691-92). The vocational expert testified that there were several jobs such a person could perform. (R. 692). These jobs included, but were not limited to: an addresser, document prep worker, or any simple repetitive jobs. Id.

The ALJ's Decision

In the remand order, the ALJ was directed to further assess physical limitations based on alleged range of motion limitations of her neck and asthma; and to further assess mental limitations based on panic attacks, and incorporate any relevant limitations into a hypothetical posited to the Vocational Expert.

The ALJ used the standard five-step test to determine if Plaintiff satisfied the burden of establishing disability. The ALJ found that the claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2005 through the date last insured (December 31, 2007) and that through December 31, 2007 Plaintiff had the following severe impairments: osteoarthritis of the neck and lower back, asthma and anxiety. (R. 633). However, she did not have combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CR1 Part 404, Subpart P, Appendix 1.

The ALJ concluded:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant: is limited to occasional postural maneuvers; is precluded from climbing ropes, ladders and scaffolds; is limited to frequent turning of head from side to side; is precluded from concentrated exposure to fumes, odors, dusts, gases and temperature extremes; is limited to simple,

routine, repetitive tasks involving simple, work-related decisions and few workplace changes; is limited to occasional interaction with supervisors, coworkers and the general public; is limited to being off-task up to 10% of the workday.

Discussion

Standard of Review

Review of the Commissioner's final decision is limited to determining whether the findings and decision are supported by substantial evidence in the record. *42 U.S.C. § 405(g)*. See *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hartranft*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted)); see also *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla. *Richardson*, 402 U.S. at 401; *Morales*, 225 F.3d at 316; *Plummer*, 186 F.3d at 422. Likewise, the ALJ's decision is not supported by substantial evidence where there is "competent evidence" to support the alternative and the ALJ does not "explicitly explain all the evidence" or "adequately explain his reasons for rejecting or discrediting competent evidence." *Sykes*, 228 F.3d 259, 266 (3d Cir. 2000).

Plaintiff's Arguments

Plaintiff's brief sets forth three issues raised by the District Court Judge's decision that Plaintiff believes were allegedly not adequately addressed by the ALJ. First, that the extent of Plaintiff's head and neck mobility were understated by the ALJ. Second, that Plaintiff's treating doctor's opinion with regard to pulmonary restrictions were ignored. And lastly, that the ALJ ignored the Plaintiff's testimony that she suffered two panic attacks per week.

In this case, the evidence is clear as Dr. Merlin notes "Range of motion of the neck, left rotation was 0-60 degrees, right rotation was 0-75 degrees, flexion 0-45 degrees, and extension 0-45 degrees."

A review of the administrative record found no support for Plaintiff's argument that she is unable to frequently turn her head from side to side. For example, on a follow up examination with Dr. Ani on July 2, 2007 there was no tenderness or spasm of the cervical spine, and she had active range of motion. At a January and August 2008 follow up, there were similar findings. In addition, an MRI of the cervical spine taken August 6, 2008, showed small posterior ridges and moderate disc bulging at C4-C5 and C5-C6 and a small central subligamentous disc herniation at C5-C6. The findings were noted as moderately impressing on the anterior thecal sac at said levels and a slight desiccation was also noted. However, no significant cord compression was noted.

While the ALJ noted that the record showed no neck tenderness or muscle spasm, he nonetheless afford great weight to the February 2009 consultative medical examination of Dr. Franky wherein he indicated Plaintiff had tenderness elicited in the neck. However, range of motion of the neck was found to be 0-60 degrees left rotation, and 0-75 degrees right rotation, with flexion 0-45 degrees, and extension 0-45 degrees -- far better than the 20 degree limitation the ALJ had assessed.

The ALJ found further found:

> Significantly, the record does not fully support the degree of limitations alleged by the claimant.
>
> There are simply no diagnostic or clinical findings indicating a total immobilization of the claimant's neck.

A review of the record reveals that the only diagnostic from 2002 through 2012 available to substantiate Plaintiff' claim of total neck immobility is an MRI from 2008 which noted moderate disc bulging at C4-C5 and C5-C6 and a small central subligamentous disc herniation at C5-C6. The findings were noted as moderately impressing on the anterior thecal sac at said levels and a slight desiccation was also noted. There was no significant cord compression noted.

Therefore, the ALJ did not err when he found Plaintiff could turn her head in either direction by 20 degrees because there is nothing in the record to support such a claim.

Second, Plaintiff contends that her asthma is so severe she is rendered disabled. With regard to the ALJ's finding on Plaintiff's asthma, the ALJ found

> The claimant's asthma does not rise to the level of meeting the chronic obstructive pulmonary disease criteria of 3.02A, with the attendant FEVI values, or meeting the frequency and severity of asthma attacks with the requisite physician intervention or in-patient hospitalization during a consecutive 12-month period. In addition, no physician has credibly opined that the claimant's impairments equal any medical listing.

For example, Listing 3.02 (Chronic Respiratory Disorders/asthma) of 20 CFR Part 404, Subpart P, Appendix 1, requires a $FEV_1$[2] level to fall within the listed category for a claimant's height and weight. In this case, there were no diagnostic tests taken by a respiratory specialist, and there are no diagnostics upon which the ALJ may rely in order to find Plaintiff disabled due to asthma.

To qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to an impairment listing, Plaintiff bears the burden of presenting "medical findings

---

[2]   Generally, asthma is characterized by airflow obstruction. Airflow obstruction is defined as a reduced FEV1 and a reduced FEV1/FVC ratio, such that FEV1 is less than 80% of that predicted, and FEV1/FVC is less than 0.7. FEV1 is the maximal amount of air you can forcefully exhale in one second. It is then converted to a percentage of normal.

equivalent in severity to all the criteria for the one most similar impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990). Meeting only some criteria of a listing, "no matter how severely, does not qualify." *Id.* at 530. Moreover, for a claimant to prove that her impairment is equivalent to a listing, she must "proffer medical findings which are equal in severity to all the criteria for the one most similar listed impairment." *Stremba v. Barnhart*, 171 F. App'x 936, 938 (3d Cir. 2006) (citing Sullivan, 493 U.S. at 530).

In addition, according to the listing 3.02, a claimant must have:

> Exacerbations or complications requiring three hospitalizations within a 12-month period and at least 30 days apart (the 12-month period must occur within the period we are considering in connection with your application or continuing disability review). Each hospitalization must last at least 48 hours, including hours in a hospital emergency department immediately before the hospitalization.

There is no evidence in the record that this had occurred. In fact, there are no records of hospitalization.

Next, Plaintiff argues that the ALJ's finding that Plaintiff was precluded from anything more than concentrated exposure to fumes, odors, dusts, gases, and temperature extremes is in err. (R. 665). This finding is consistent with Dr. Paolini's Residual Functional Capacity Assessment wherein he found that Plaintiff must "avoid even moderate exposure" to fumes, odors, dusts, gasses; i.e. she is precluded from same. (R. 321)

Plaintiff also argues that the ALJ did not credit Plaintiff's own testimony with regard to asthma triggers such as animals, perfume, ink, etc. However, it was Plaintiff's own testimony that she owns two cats who live in the home with her, as well as the fact that she had been smoking off and on during the relevant time period, had been advised to quit by her treating

physician and prescribed Chantix, but she declined to do.  In short, there was sufficient evidence

for the ALJ to conclude that Plaintiff's asthmatic condition would not preclude all work activity.

With regard to Plaintiff's mental health, the ALJ found:

> The severity of the claimant's mental impairment did not meet or
> medically equal the criteria of listing 12.06. In making this finding,
> the undersigned has considered whether the "paragraph B" criteria
> were satisfied. To satisfy the "paragraph B" criteria, the mental
> impairment must result in at least two of the following: marked
> restriction of activities of daily living; marked difficulties in
> maintaining social functioning; marked difficulties in maintaining
> concentration, persistence, or pace; or repeated episodes of
> decompensation, each of extended duration. A marked limitation
> means more than moderate but less than extreme. Repeated
> episodes of decompensation, each of extended duration, means
> three episodes within 1 year, or an average of once every 4 months,
> each lasting for at least 2 weeks.

Plaintiff argues that the ALJ ignored Plaintiff's testimony that she suffered two panic

attacks per week, and Dr. Abenante's note that Plaintiff has "panic attacks once or twice per

week."

However, it appears that the ALJ correctly assessed Plaintiff's mental impairment based

on the criteria of list 12.06.   In making the finding, the ALJ considered whether the paragraph

"B" criteria was satisfied. That criteria requires that the mental impairment must be in at least

two of the following: marked restriction of activities of daily living; marked difficulties in

maintaining social functioning; marked restriction in activities of daily living; marked difficulties

in maintaining social functioning; marked difficulties in maintaining concentration, persistence,

or pace; or repeated episodes of decompensation, each of extended duration.   Marked limitation

means more than moderate but less than extreme.   Repeated episodes of decompensation, each

of extended during, means three episodes within 1 year, or an average of once over four months,

each last for at least two weeks.

In her activities as set forth in the daily living report, Plaintiff reports doing light house work and shopping, working out to the best of her ability, cooking, resting, feeding her cats, and watching television. Plaintiff also explained that she is responsible for caring for her spouse. Plaintiff shops for necessities (food, clothes, toiletries, etc.) using all available retail outlets (stores, phone, mail, and computer). Plaintiff also reported that her memory, understanding and following instructions capabilities are intact. (R. 125). These activities supports the mental residual functional capacity assessment that Plaintiff does not suffer from any "marked" limitations in mental functioning, and Plaintiff therefore fails to prove that she meets the listing for the impairment.

The ALJ also found that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible because her complaints are not substantiated by the evidence.

For example,

* Although Plaintiff experiences some neck pain, she has never consulted or treated with an orthopedic specialist in order to seek resolution of the problem. Instead, the pain is managed by medications. In addition, no treating physician has ever opined that Plaintiff is unable to turn her neck frequently.

* At the hearing, Plaintiff stated she still has asthma, but said of her condition: "I still have problems here and there. I still take medications every day. I still, you know, have my sprays on hand in case of emergency."

* At a February 7, 2009 evaluation by Dr. Francky Merlin, Plaintiff reported that she had been diagnosed with asthma 28 years ago and that her last attack was a year prior to the examination.

\* At a December 28, 2006 psychiatric consultative examination Plaintiff reported to Dr. Williams that she was not currently involved in psychiatric treatment. She reported being on Prozac in 1992, and was later prescribed Xanax for nine years but she discontinued it in 2003 due to fears of dependency. She reported that she was no longer on her current medications because she does not want to be reliant on medications.

\* At that same examination, Plaintiff reported never being hospitalized either psychiatrically or medically.

The Commissioner has discretion to evaluate the credibility of the Plaintiff's complaints. *Jenkins v. Commissioner*, 2006 U.S. App. Lexis 21295 (3d Cir. 2006). The credibility of witnesses is quintessentially the province of the trier of fact. *See generally*, *Scully v. U.S. Wats, Inc.*, 238 F. 3d 497 (3d Cir. 2001). This case is before the Court to determine if there is substantial evidence to support the ALJ's findings with regard to Plaintiff's limitations based on her range of motion of her neck and asthma as well as Plaintiff's mental limitations based on Plaintiff's panic attacks.

The Court's sole inquiry is whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the commissioner, and even where evidence is susceptible of more than one rationale interpretation, it is the Commissioner's conclusions which must be upheld. *Fargnoli v. Massanari*, 247 F. 3d 34, 38 (3d Cir. 2000)

It is the Court's finding that the ALJ's decision was based on substantial evidence and is affirmed.

ORDER

This matter having been opened to the Court on the appeal of Plaintiff, Beth Szaroleta of

the Commissioner of Social Security's decision denying same;

For the reasons set forth above;

IT IS on this 16th day of  November, 2017;

ORDERED that the decision of the Commissioner of Social Security is affirmed. The

Clerk is directed to close the case.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.